IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIKA P. BORINO, | : | |
| | : | |
| Plaintiff | : | CIVIL NO. 4:10-CV-2135 |
| | : | |
| vs. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Rambo) |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

MEMORANDUM AND ORDER

## Background

Plaintiff, Erika P. Borino, is seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her claim for social security disability insurance benefits and supplemental security income benefits.  For the reasons set forth below, the court will affirm the decision of the Commissioner.

On January 29, 2007, Borino protectively filed[1] an application for disability insurance benefits and an application for supplemental security income benefits.

---

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

Tr. 13, 64-65 and 83-90.[2]  On April 2, 2007, the Bureau of Disability Determination[3] denied Borino's applications. Tr. 66-74.  On April 16, 2007, Borino requested a hearing before an administrative law judge. Tr. 75.  A hearing was held before an administrative law judge on October 14, 2008. Tr. 22-44.  On November 21, 2008, the administrative law judge issued a decision denying Borino's applications. Tr. 13-21.  On January 15, 2009, Borino requested that the Appeals Council review the administrative law judge's decision. Tr. 8, 145-148 and 396-397.  The Appeals Council concluded on August 18, 2010, that there was no basis upon which to grant Borino's request for review. Tr. 1-5.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

---

2.  References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on February 11, 2011.

3.  The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania that initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 66 and 70.

Borino then filed a complaint in this court on October 15, 2010.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on August 11, 2011, when Borino elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Borino met the insured status requirements of the Social Security Act through December 31, 2010. Tr. 13, 15 and 103.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or

_____

4.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

3

no income.  Insured status is irrelevant in determining

a claimant's eligibility for supplemental security

income benefits.

Borino was born in the United States on December

25, 1971, and at all times relevant to this matter was

considered a "younger individual" whose age would not

seriously impact her ability to adjust to other work.[5]

Tr. 27, 64-65, 83, 88, 99 and 102.

Borino graduated from high school and can read,

write, speak and understand the English language and

perform basic mathematical functions. Tr. 28.  After

high school, Borino attended college for four years and

obtained a Bachelor of Science degree in accounting from

the Pennsylvania State University.[6] Tr.  28, 39 and 112.

---

5.  The Social Security regulations state that "[t]he
term younger individual is used to denote an individual
18 through 49."  20 C.F.R., Part 404, Subpart P,
Appendix 2, § 201(h)(1); 20 C.F.R. §§ 404.1563(c) and
416.963(c).

6.  Borino graduated from college in 1994. Tr. 112.  The
record does not reflect when Borino graduated from high
school.

Borino's past relevant employment[7] was as a department manager for Wal-Mart from March 1995, to October 6, 2006, described by a vocational expert as skilled, medium work.[8]   Tr. 39, 93-95, 108 and 114. Borino also

_____

7. Past relevant employment in the present case means work performed by Borino during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

8. The terms sedentary, light and medium work are defined in the Social Security regulations as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can

(continued...)

had employment as a cashier and food service worker at a Burger King from 1988 through 1995[9] and as a cashier and

---

8.   (...continued)
          also do sedentary work, unless there are
          additional limiting factors such as loss of
          fine dexterity or inability to sit for long
          periods of time.

          (c) *Medium work*.  Medium work involves lifting
          no more than 50 pounds at a time with frequent
          lifting or carrying of objects weighing up to
          25 pounds.  If someone can do medium work, we
          determine that he or she can do sedentary and
          light work.

20 C.F.R. §§ 404.1567 and 416.967.


9.   The earnings records maintained by the Social
Security Administration do not refer to Burger King.
Tr. 92-93.  Shavertown Foods Company was recognized by
Borino as being the same as Burger King. Tr. 114.
Borino was unsure of one employer identified in the
earning records maintained by the Social Security
Administration. Id. That employer was "Edmond K & P
Davis." Id. The employer identified for Borino's work
at Burger King in the Social Security Administration's
earnings records is "Edmond K & P Davis J G & J E
Morgan J & W Powell & E Snyder PTR Shavertown Foods
Company" with an employer identification number (EIN)
of 232017252.  Tr. 92. Shavertown Foods Company and
Edmond K & P Davis, et al., have the same EIN. Id.

display person at the Pennsylvania State University book store during 1991.[10]  Tr. 92-93 and 114.

Records of the Social Security Administration reveal that Borino had reported earnings in 1988 through 2006 as follows: in 1988 $2192.77, 1989 $5906.32, 1990 $4324.50, 1991 $3949.84, 1992 $4680.85, 1993 $3705.40, 1994 $5314.86, 1995 $14,511.60, 1996 $29,507.60, 1997 $31,322.50, 1998 $33,805.52, 1999 $36,329.37, 2000 $38,197.63, 2001 $33,030.65, 2002 $21,046.35, 2003 $20,504.80, 2004 $15,059.85, 2005 $21,503.74, and 2006 $17,398.78. Tr. 98.  Borino's total earnings during those years were $342,292.93. Id.  Borino had reported earnings totaling $901.00 in the first and second quarter of 2007 attributable to vacation pay. Tr. 29 and 91. Borino has no reported earnings after the second quarter of 2007. Id.

---

10.  Borino also had employment at a Weis Markets in 1993. Tr. 93.  However, we are unable to discern from the record what position Borino held at that company.

Borino claims that she became disabled on
October 6, 2006, because of fibromyalgia[11] and neck,

_____

11.  Fibromyalgia is described by the American College
of Rheumatology in pertinent part as follows:

Fibromyalgia is an often misunderstood – even
unrecognized – disorder that causes widespread
muscle pain and tenderness which tends to come
and go, and move about the body.  This common
and chronic condition also can be associated
with fatigue and sleep disturbances.

Fast facts

● Fibromyalgia affects 2-4% of the
population, predominantly women.

● Fibromyalgia is diagnosed based on
patient symptoms and physical examination.
There is no laboratory, radiographic, or
other diagnostic test, but these can be
used to exclude other conditions.

*    *    *    *    *    *    *    *    *    *

What is fibromyalgia?

Fibromyalgia is defined by chronic widespread
muscular pain and symptoms such as fatigue,
sleep disturbance, stiffness, cognitive and
memory problems, and symptoms of depression and
anxiety.  More localized pain conditions often
occur in patients with fibromyalgia,
including migraine or tension headaches,
temporomandibular disorder, irritable bowel
syndrome, gastroesophageal reflux disorder,
irritable bladder, and pelvic pain syndrome.
The symptoms of fibromyalgia and associated

(continued...)

---

11.   (...continued)
        conditions can vary in intensity and wax and
        wane over time. Stress often worsens these
        symptoms.

        *    *    *    *    *    *    *    *    *    *    *

American College of Rheumatology, Practice Management,
Fibromyalgia, http://www.rheumatology.org/practice/
clinical/patients/diseases_and_conditions/fibromyalgia.
asp (Last accessed April 17, 2012). Also, "it is often
the rheumatologist who makes the diagnosis (and rules
out other rheumatic diseases), but [the] primary care
physician can provide all the care and treatment for
fibromyalgia . . . ." Id.

    The Mayo Clinic website sets forth the criteria
for diagnosing fibromyalgia as follows:

    Tests and diagnosis

    In 1990, the American College of Rheumatology
    (ACR) established two criteria for the
    diagnosis of fibromyalgia:

        ■ Widespread pain lasting at least 3 months

        ■ At least 11 positive tender points-out of
          a total possible of 18

    But fibromyalgia symptoms can come and go.  And
    many doctors were uncertain about how much
    pressure to apply during a tender point exam.
    While the 1990 guidelines may still be used by
    researchers studying fibromyalgia, less
    stringent guidelines have been developed for
    doctors to use in general practice.
    These newer diagnostic criteria include:

                                      (continued...)

back and knee pain.  Tr. 66 and 107.  Borino contends
that she is unable to walk long distances, lift more
than 15 pounds, stand more than 1 hour at a time and sit
more than 1 hour. Tr. 128.  Borino further claims she
has problems with squatting, bending, reaching,
kneeling, stair climbing, completing tasks and
concentration. Tr. 128-129.  When given an opportunity
to do so on a "check box" form, Borino did not indicate
that she had a problem with talking, hearing, seeing,
memory, understanding, following instructions, using her
hands and getting along with others. Id.  Borino also
contends that she suffers from fatigue, irritable bowel
syndrome and an overactive bladder with incontinence.

---

11.  (...continued)
      ■ Widespread pain lasting at least three
      months

      ■  No other underlying condition that might
      be causing the pain

Fibromyalgia, Tests and diagnosis, Mayo Clinic staff,
http://www.mayoclinic.com/health/fibromyalgia/DS00079/D
SECTION=tests-and-diagnosis (Last accessed April 17,
2012).

Tr. 35 and 37-38.  Borino has not worked since October

6, 2006.[12]

     For the reasons set forth below we will affirm

the decision of the Commissioner denying Borino's

applications for disability insurance benefits and

supplemental security income benefits.

**STANDARD OF REVIEW**

     When considering a social security appeal, this

court has plenary review of all legal issues decided by

the Commissioner.  <u>See</u> <u>Poulos v. Comm'r of Soc. Sec.</u>,

474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Comm'r of</u>

<u>Soc. Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999);

<u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir.

1995).  However, our review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to

determine whether those findings are supported by

"substantial evidence."  <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d

_____

12.  Borino was 34 years old at the onset of her alleged
disability and 36 years old at the time of the
administrative hearing and on the date the
administrative law judge issued the decision denying
her applications.

1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001);  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consol. Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Comm'r</u>

12

of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008);
Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).
Substantial evidence has been described as more than a
mere scintilla of evidence but less than a
preponderance.  Brown, 845 F.2d at 1213.  In an
adequately developed factual record, substantial
evidence may be "something less than the weight of the
evidence, and the possibility of drawing two
inconsistent conclusions from the evidence does not
prevent an administrative agency's finding from being
supported by substantial evidence." Consolo v. Fed.
Maritime Comm'n, 383 U.S. 607, 620 (1966).

     Substantial evidence exists only "in
relationship to all the other evidence in the record,"
Cotter, 642 F.2d at 706, and "must take into account
whatever in the record fairly detracts from its weight."
Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488
(1971).  A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing
evidence or fails to resolve a conflict created by the

evidence.  <u>Mason</u>, 994 F.2d at 1064.   The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.   Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity

14

> that he is not only unable to do his previous
> work but cannot, considering his age, education,
> and work experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which
> he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if
> he applied for work.  For purposes of the
> preceding sentence (with respect to any
> individual), "work which exists in the national
> economy" means work which exists in significant
> numbers either in the region where such
> individual lives or in several regions of the
> country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[13] (2) has an impairment

---

13.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20
(continued...)

that is severe or a combination of impairments that is

severe,[14] (3) has an impairment or combination of

impairments that meets or equals the requirements of a

---

13.  (...continued)
C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

14.   The determination of whether a claimant has any
severe impairments, at step two of the sequential
evaluation process, is a threshold test. 20 C.F.R. §§
404.1520(c) and 416.920(c). If a claimant has no
impairment or combination of impairments which
significantly limits the claimant's physical or mental
abilities to perform basic work activities, the
claimant is "not disabled" and the evaluation process
ends at step two. Id.  If a claimant has any severe
impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g).
Furthermore, all medically determinable impairments,
severe and non-severe, are considered in the subsequent
steps of the sequential evaluation process.  20 C.F.R.
§§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).
An impairment significantly limits a claimant's
physical or mental abilities when its effect on the
claimant to perform basic work activities is more than
slight or minimal. Basic work activities include the
ability to walk, stand, sit, lift, carry, push, pull,
reach, climb, crawl, and handle. 20 C.F.R. §
404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand,
carry out and remember simple instructions, and respond
appropriately to supervision, coworkers and work
pressures. 20 C.F.R. § 1545(c).

listed impairment,[15] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[16]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional

_____

15.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

16.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

17

capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before the court addresses the administrative law judge's decision and the arguments of counsel, the court will first review in detail Borino's medical records.

On May 29, 2001, at the age of 29, Borino had an appointment with Marianne J. Santioni, D.O., a rheumatologist, located in Taylor, Pennsylvania. Tr. 264. At that appointment, Borino complained of fatigue, left knee and lumbar pain and that her "hands get sore." Id. An x-ray of Borino's back was normal; she had no joint swelling; and she had no rashes. Id. Dr. Santioni prescribed medications. Id.

18

Rheumatology blood testing performed on May 29, 2001, was essentially normal. Tr. 311.[17] A total body bone scan on June 11, 2001 was normal. Tr. 310.

On July 3, 2001, at an appointment with Dr. Santioni where Borino complained of fatigue and knee, back and hand pain, and more than five years before Borino's alleged disability onset date, Borino was diagnosed by Dr. Santioni as suffering from "probable fibromyalgia."  Tr. 264.

After this appointment, it appears that Dr. Santioni attempted to obtain insurance authorization for Celebrex, a nonsteroidal anti-inflammatory drug. Id.  On July 20, 2001, that request was denied by the insurance company. Tr. 305.  However, the notes of an appointment with Dr. Santioni on September 28, 2001, indicate that Dr. Santioni started Borino on the drug Celebrex. Tr. 309.

---

17.  Two of the tests appear to be elevated.  However, Dr. Santioni in subsequent medical notes does not mention them or place any significance on those elevated test results.

The notes of an appointment with Dr. Santioni on February 26, 2002, indicate that the physical examination revealed "multiple tender points on palpation" but that Borino was "doing quite well on Celebrex" and that Borino would "continue with [the] medication." Tr. 303.

Borino returned to see Dr. Santioni three months later with complaints of elbow pain and left knee swelling and pain.  Tr. 263.  However, the notes of this appointment on May 14, 2002, suggest that Borino was occasionally walking, she had "multiple tender points" but the examination was normal otherwise. Id. Furthermore, an MRI of the left knee taken on February 27, 2002, revealed "no significant findings." Tr. 302.

On June 21, 2002, Borino had an appointment with David J. Kolessar, M.D., an orthopedic surgeon, regarding her left knee pain. Tr. 152-153.  Range of motion testing of Borino's hip and knee was normal and she had a negative straight leg raise test.  Also, varus and valgus stress testing did not increase Borino's

pain;[18] Drawer and Lachman testing was negative; the

pivotal shift test was negative;[19] the McMurray's test

was negative;[20] and there was no effusion in the knee

(i.e., swelling of the knee from an accumulation of

fluid). Tr. 152. Borino did have "focal tenderness over

[an] adipose [fatty] collection in the pes bursa region"

and "minimal tenderness at the patellar tendon region."[21]

Id.   An x-ray and MRI of the knee were unremarkable.

Id.   Dr. Kolessar concluded that Borino suffered from

_____

18.  Varus and valgus stress testing is where the femur
the upper leg is maintained in a fixed position while
the lower leg is bent at the knee inward and outward.

19.  Drawer and Lachman testing and pivotal shift
testing is to determine whether there is instability in
the anterior cruciate ligament, one of the ligaments of
the knee.

20.  The McMurray's test is to determine whether there
is a meniscal tear.  Between the thighbone and the
shinbone are two rings of cartilage called menisci
which provide stability and cushion the knee joint,
acting as shock absorbers.

21.  The pes bursa region is an area at the top of the
shin bone on the inside of the knee.  The patella is
the knee cap.

mild pes anserine bursitis,[22] a fatty deposition at and below the medial proximal tibia, morbid obesity, and a history of fibromyalgia. Id.  He further found no need for orthopedic intervention and recommended conservative treatment involving "stretching, reconditioning, weight reduction, anti-inflammatories, and comfort measures." Tr. 153.

On August 27, 2002, Borino had an appointment with Dr. Santioni at which Borino complained of left knee pain. Tr. 263.  The next notations in Dr. Santioni's treatment records of Borino are that Borino was prescribed Elavil on February 26, 2003, apparently because of difficulty sleeping and that Borino was a "no show" at an appointment on April 1, 2003. Tr. 262-263. At an appointment with Dr. Santioni on July 18, 2003, Borino reported that she was unable to sleep and that two fingers on her left hand were "hurting" and that the

22.  Bursitis is an inflammation of the bursa, a fluid filled sac.

"bumps on [her] knuckles [were] bigger."[23] Tr. 262.  The
record of this appointment also indicates that Borino
was six weeks pregnant. Id.  The medical notes suggest
that various medications were stopped because of
Borino's pregnancy and that Borino would "be seen after
her delivery." Tr. 261-262.

On September 18, 2003, Dr. Santioni asked
Borino's employer to temporarily reduce her work
schedule to 28 hours per week because of Borino's
"fibromylagia complicated by pregnancy." Tr. 298-299.
After this request by Dr. Santioni, it appears that
Borino did not have an appointment with Dr. Santioni
until December, 2004. Tr. 261 and 296.

On December 7, 2004, Borino complained to Dr.
Santioni that her hands and elbows for two months were
not functioning and that she had sharp pain in her
tailbone. Tr. 261.  Borino also appears to have
complained about having difficulty sleeping. Id.  A
physical examination revealed 18 out of 18 fibromyalgia

---

23.  Borino is right-handed. Tr. 27.

tender points. Id.  Other than this finding, there are
no abnormal physical examination findings noted. Id.  It
appears[24] that Dr. Santioni ordered blood work and
prescribed the drug Soma[25] and lidoderm patches. Id.  Dr.
Santioni also completed a medical leave request on
behalf of Borino for the period December 2 to December
13, 2004. Tr. 296.  Dr. Santioni stated in that request
to Wal-Mart that Borino was under her care for
fibromyalgia. Id.

On December 29, 2004, Borino had an appointment
with Dr. Santioni. Tr. 261 and 280.  After that
appointment, Dr. Santioni's physician's assistant wrote
a letter to Luigi Spagnoli, M.D., which states as
follows:

> We had the pleasure of seeing your patient in
> office today in follow up of her fibromyalgia

---

24.  Dr. Santioni's handwriting is difficult to decipher and
her notes are short and cryptic.

25.  Soma, generic name carisoprodol, is a muscle
relaxer. Soma, Drugs.com, http://www.drugs.com
/soma.html (Last accessed April 19, 2012).

and worsening polyarthralgias.[26]  She still complains of a lot of pain in her hands with discomfort through her tender points.  She was given Soma, which knocks her out.  She is going to try to take ½ tablet now at bedtime. She is also on Prozac.

She had an ANA[27] with all more specific serologies done, which all came back unremarkable at this time.

Her physical examination still reveals 18 out of 18 tender points.  She is tender through her second and third MCP's[28] and in her bilateral wrists. Heart rate is regular with no murmurs, rubs or gallops.  Lungs are clear. Neurological exam is unremarkable.

At this time we are going to be checking a CPK, S-pep, celiac sprew panel, 25-hydroxyl vitamin D, TSH and a total body bone scan.

We will be following her up after the total body bone scan. We will also be starting Voltarin-75mg 1 po bid.

---

26.  Polyarthralgia is defined as "pain in several joints simultaneously." Mosby's Medical Dictionary, 8th Edition, 2009, http://medical-dictionary.thefree dictionary.com/polyarthralgia (Last accessed April 19, 2012).

27.  "ANA" is an abbreviation for anti-nuclear antibody test. ANA test, Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/ana-test/MY00787 (Last accessed April 19, 2012).

28.  The "MCP's" are the metacarpalphalangeal joints, the knuckles.

     The patient was seen and also examined by Dr.
     Santioni.

Tr. 280.  This letter was signed by Michelle Lucas, a

certified physician's assistant, as well as by Dr.

Santioni.[29]

     The next appointment Borino had with Dr.

Santioni was on March 29, 2005. Tr. 260.  The notes of

this appointment indicate that Borino had "18/18 tender

points" and "fibro only."  The notes do not give an

indication of the results of the additional diagnostic

testing ordered on December 29, 2004.  However,

notations on the laboratory reports reveal that the

total body bone scan was negative (normal) and that

Borino had "no inflammatory arthritis."[30] Tr. 281.

_____

29. Although it appears a stamp may have been used to
affix Dr. Santioni's signature.

30. The result of the CPK test (creatine phosphokinase
test) was elevated at 140 U/L (normal range 30-135
U/L). Tr. 282. However, Dr. Santioni did not comment on
this test or give any indication that it was of
significance.  Moreover, as previously stated, Dr.
Santioni found that Borino had no inflammatory
arthritis and was suffering from "fibro only." We
assume that by stating that Borino hand no inflammatory
                                        (continued...)

At an appointment on August 5, 2005, Borino told Dr. Santioni that she felt much worse because of her financially caused non-compliance with her medication regimen. Tr. 278. A physical examination revealed multiple tender points consistent with fibromyalgia; the examination findings were otherwise unremarkable. Id. Dr. Santioni gave Borino a two months supply of samples of Lexapro[31] and Provigil[32] and referred Borino to physical therapy. Id.

After receiving physical therapy for three months, Borino's physical therapist indicated in November 2005 that Borino was independent with all functional mobility, ambulates independently without

---

30.   (...continued)
arthritis and suffered from "fibro only" that Dr. Santioni was ruling out the possibility that Borino suffered from an autoimmune disorder, including Rheumatoid Arthritis.

31.   Lexapro is an anti-depressant medication.  Lexapro, Drugs.com, http://www.drugs.com/lexapro.html (Last accessed April 19, 2012).

32.   "Provigil (modafinil) is a medication that promotes wakefullness." Provigil, Drugs.com, http://www.drugs.com/provigil.html (Last accessed April 19, 2012).

deviation and had normal balance/sensation. Tr. 246-248.
Borino had normal cervical range of motion and some
improvement in her lumbar range of motion. Id.  Borino
was discharged from the physical therapy program to a
home exercise program. Id.

Other than a report of a sinus x-ray performed
on January 10, 2006, which revealed "[n]ormal paranasal
sinuses" and a "[m]ild deviation of the nasal septum,"
after Borino was discharged from physical therapy, we
discern no medical records until September 5, 2006, when
Borino underwent an electromyography (EMG) of the upper
extremities. Tr. 319.  The results of the EMG were
normal and revealed "[n]o electrophysiological evidence
of compressive median or ulnar neuropathy, myopathy or
cervical radiculopathy." Id.

Six days later, Borino's primary care physician,
Michalene Torbik, D.O., listed in his notes Borino's
subjective complaints of numbness in her hands from the
wrists down and some urinary incontinence. Tr. 326.  Dr.
Torbik found intact range of motion in Borino's

28

extremities but ordered laboratory work including thyroid testing and a second EMG study. Id.  Dr. Torbik also referred Borino to a urologist regarding Borino's complaints of urinary incontinence and a dermatologist regarding a small lesion on Borino's abdomen. Id.

A report from Michael F. Sedlak, M.D., a urologist, dated October 16, 2006, stated that Borino's urinalysis was normal and that a cystoscopy and cystometrogram would be scheduled. Tr. 154.  Those procedures were performed on November 6, 2006. Tr. 155. The cystoscopy revealed a normal bladder and the cystometrogram "was consistent with an overactive bladder" and "some degree of a cystocele," a prolapsed bladder. Id.  Dr. Sedlak recommended Kegel exercises and started Borino on Detrol. Id.

After having not seen Dr. Santioni for a year, on October 18, 2006, Borino had an appointment with Dr. Santioni complaining of dropping items and having upper extremity weakness, numbness in her hands at night, pain in the lower extremity radiating to the buttocks and

difficulty sleeping. Tr. 253 and 258.  A physical
examination revealed that Borino was in no acute
distress, her cardiac and respiratory functioning was
normal, there was no evidence of synovitis,[33] and her
reflexes were intact and symmetric. Id.  Dr. Santioni
did note "multiple tender points consistent with
fibromyalgia as well as significant cervical
paravertebral spasm." Id.  Dr. Santioni's assessment was
that Borino suffered from fibromyalgia and prescribed
Flexeril,[34] Provigil and Lidoderm patches. Id.  Dr.
Santioni also ordered blood work. Id.

The blood testing essentially came back normal
except for a "moderate/strong positive" Cyclic
Citrullinated Peptide (CCP) Antibody test. Tr. 274.
However, Borino had a negative Rheumatoid Factor (RF)
blood test, a normal Erythrocyte Sedimentation Rate

---

33. Synovitis is an inflammation of the membrane which
lines joints (the synovial membrane). Dorland's
Illustrated Medical Dictionary, 1839 (30th Ed.  2003).

34. Flexeril is a muscle relaxant. Flexeril, Drugs.com,
http://www.drugs.com/flexeril.html (Last accessed April
19, 2012).

(ESR) blood test, and a normal anti-nuclear antibody (ANA) blood test. Tr. 273 and 276-277.  It appears that in response to the positive CCP antibody test, Dr. Santioni, at an appointment with Borino on November 1, 2006, ordered x-rays of Borino's hands, wrists and feet.[35] Tr. 253.  At that appointment Borino also asked Dr. Santioni to recommend her for short-term disability. Tr. 253.

The x-rays were conducted on November 6, 2006, and were unremarkable other than the x-ray of the right hand revealed a "[q]uestionable curvilinear density at the base of the proximal phalanx of the middle

-------------------

35.  A positive CCP test is suggestive of Rheumatoid Arthritis. "When people with signs and symptoms of arthritis are positive for both CCP antibody and RF, it is very likely that they have RA and it is likely they may develop a more severe form of the disease. When people are positive for CCP antibody but not RF, or have low levels of both, and have clinical signs that suggest RA, then it is likely they have early RA or that they will develop RA in the future." Cyclic Citrullinated Peptide Antibody, Lab Tests Online, http://labtestsonline.org/understanding/analytes/ccp/ta b/test (Last accessed April 18, 2012).  The x-rays of Borino's hands, wrists and feet were ordered to see if there were any objective clinical signs of arthritis.

finger[.]" Tr. 267-269.  It was noted that the

"curvilinear density" was of "questionable significance

and could be related to an avulsion fracture[36]

/degenerative in nature."  The joint spaces of the hands

were preserved and there was no apparent soft tissue

swelling. Tr. 267-269.

From November 2, 2006, to January, 20, 2007,

Borino attended physical therapy at Riverside

Rehabilitation, in Plains, Pennsylvania. Tr. 161-244.

The physical therapy discharge summary indicates that

the goals of the treatment relating to functionality

were partially met. Tr. 228.

On December 4, 2006, Borino had an appointment

with Dorothy A. Farrell, M.D., a neurologist, regarding

her pain. Tr. 339. Dr. Farrell found tender points and a

decreased range of motion in Borino's cervical spine.

36.  "An avulsion fracture is an injury to the bone in a
place where a tendon or ligament attaches to the bone.
When an avulsion fracture occurs, the tendon or
ligament pulls off a piece of the bone." Jonathan
Cluett, M.D., Avulsion Fracture, About.com,
http://orthopedics.about.com/od/brokenbones/a/avulsion.
htm (Last accessed April 19, 2012).

<u>Id.</u>  She also appears[37] to have found a positive Adson's sign[38] on the left with radiculopathy but otherwise a normal examination with the exception of multiple tender points.  <u>Id.</u>  Dr. Farrell ordered an MRI of Borino's cervical spine.  <u>Id.</u>  Dr. Farrell's assessment was that Borino suffered from a "history consistent with fibromyalgia, cervical myofascial pain."  <u>Id.</u>  She also suspected Borino suffered from "mild Thoracic Outlet Syndrome" and noted that she would reevaluate Borino after the MRI.  <u>Id.</u>

On December 13, 2006, Borino had an appointment with Dr. Sedlak regarding Borino's complaints of urinary incontinence. Tr. 156.  Dr. Sedlak noted that Borino was

---

37.  Dr. Farrell's handwriting is difficult to decipher.

38.  A positive Adson's sign or test suggests the presence of Thoracic Outlet Syndrome. Thoracic outlet syndrome is a condition involving pain in the neck and shoulder, numbness and tingling of the fingers, and a weak grip. It results from the compression of nerves and blood vessels that pass through a narrow space near the shoulder and collar bone on their way to the arms. Thoracic outlet syndrome, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0002406/ (Last accessed April 18, 2012).

started on Detrol and that Borino reported that she was doing much better. Id.  Dr. Sedlak recommended that Borino continue the Kegel exercises and taking Detrol. Id.

On December 21, 2006, Borino had an MRI of the cervical spine which was essentially normal. Tr. 359. There was no evidence of herniations or spinal stenosis. Id.  At the C4-C5 levels there was minimal degenerative disease and a "very minimal central disc bulge." Id.

On December 27, 2006, Borino had an appointment with Dr. Santioni at which she complained of severe pain in the right lower thoracic region. Tr. 257.  Dr. Santioni's assessment was that Borino suffered from a low back strain and fibromyalgia and Dr. Santioni administered three lumbar tender point injections (Depo-Medrol and Lidocaine) on the right side. Id.

On January 23, 2007, Borino had a follow-up appointment with Dr. Santioni regarding her fibromyalgia. Tr. 255-256.  Physical examination findings were essentially normal except for multiple

34

tender points consistent with fibromyalgia.[39] Tr. 255.
There was no evidence of synovitis and the joints of the
fingers, knuckles, wrists, elbows, shoulders, knees,
ankles and the bones of the midfoot (metatarsals) and
toes (phalanges) were all unremarkable. Id.

On January 30, 2007, Borino had a follow-up
appointment with Dr. Farrell, the neurologist. Tr. 341
and 351-358.  The notes of this appointment are
illegible and we will not attempt to decipher them.
Furthermore, Borino in her brief has not referred to or
relied on the notes of this appointment.

On February 1, 2007, Borino had an appointment
with Dr. Torbik regarding head, neck and shoulder pain.
Tr. 317.  Dr. Torbik found that Borino's neck extension
and side bending ranges of motion were "approximately

---

39.  The diagnostic criteria used by Dr. Santioni for
fibromyalgia are rather amorphous: the tender point
examination and the subjective complaints of pain.  In
fact, the present diagnostic criteria as stated in
footnote 11 are the subjective complaints of pain
lasting at least three months (finding a specific
number of tender points is no longer required) and the
exclusion of any other cause.

35

65% of physiologic normal." Id.  Dr. Torbik also found
that Borino had equal hand strength and her distal
pulses were intact. Id.  Dr. Torbik's treatment note
suggests that Borino was capable of light duty work
because he states as follows: "There is no light duty
offered by her employer so she is out until I see her
back in April." Id.

On March 6. 2007, Dr. Santioni completed a
disability insurance form on behalf of Borino which was
submitted by Hartford Life Insurance Company. Tr. 265-
266.  On the form, Dr. Santioni indicated that Borino's
primary diagnosis was fibromyalgia and her secondary
diagnosis was polyarthralgias. Id.  Dr. Santioni
referred to Borino's subjective complaints of muscle and
joint pain, difficulty sleeping and fatigue. Id.  Dr.
Santioni also referred to Borino's essentially normal
physical examination findings except for the 18 out of
18 tender points. Id.

Dr. Santioni then was asked on the form to
describe the extent of Borino's limitations resulting

from her disorder and its expected duration with respect
to (1) standing, (2) walking, (3) sitting, (4) lifting
/carrying, (5) reaching/working overhead, (6) pushing,
(7) pulling, (8) driving and (9) keyboard use/repetitive
hand motion. Id.  With regard to those nine areas of
functioning Dr. Santioni responding as follows:

Standing: Able - Unable to stand >[40] 1 hour in an
8 hour work day - needs breaks[.]

Walking: Able - Unable to ambulate distances - short
distances are able[.]

Sitting:  Able - may need frequent breaks -
difficulty sitting > 1 hour in an 8 hour day[.]

Lifting/carrying: Unable to lift > 15 lbs or carry
> 15 lbs[.]

Reaching/working overhead: Difficulty [with]
overhead activity or repeated motion[.]

Pushing: Unable to push > 15 lbs[.]

Pulling: Unable to pull > than 15 lbs[.]

_____

40. Dr. Santioni used the mathematical symbol ">" which
means "greater than."

Driving: Able - need frequent breaks[.]

Keyboard use/repetitive hand motion: Repetitive

motion is difficult - needs frequent breaks[.]

Id.   Dr. Santioni does not refer to any objective

examination findings (other than the amorphous 18 out of

18 tender points)[41] in support of the functional

limitations and Dr. Santioni's assessment appears to be

based primarily on Borino's subjective complaints.  Dr.

Santioni also was asked to comment on whether Borino had

any psychiatric impairments. Id.  Dr. Santioni stated

that Borino had essentially good functioning with

respect to her mental abilities. Id.  She further stated

that Borino was "[o]ccupationally and socially

effective." Id.

On March 22, 2007, Borino had an appointment

with Dr. Farrell. Tr. 349-350.  Dr. Farrell's notes are

---

41.  There is no explanation as to how the 18 out of 18
tender points translates into a finding that Borino is
unable to stand greater than 1 hour in an 8 hour
workday, unable to sit greater than 1 hour in an 8 hour
workday, and  unable to lift/carry greater than 15
pounds as well as the other limitations set by Dr.
Borino.

short, cryptic and  illegible.  We will not attempt to decipher them.  Furthermore, as stated above, Borino in her brief has not referred to or relied on Dr. Farrell's treatment notes.

On March 30, 2007, Louis Tedesco, M.D., on behalf of the Bureau of Disability Determination, reviewed Borino's medical records and completed an assessment of Borino's residual functional capacity. Tr. 329-334.  Dr. Tedesco concluded that Borino could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit with normal breaks about 6 hours in an 8-hour workday; and pushing and pulling was unlimited other than shown for lifting and/or carrying. Tr. 330.  As for postural activities, Dr. Tedesco found that Borino could frequently balance and stoop and occasionally kneel, crouch, crawl, and use ramps and climb stairs but that Borino should never climb ladders, ropes or scaffolds. Tr. 331.  Dr. Tedesco found that Borino had no manipulative, visual or

communicative limitations. Tr. 331-332.  Finally, Dr.
Tedesco found with respect to environmental limitation
that Borino should avoid concentrated exposure to
hazards, such as machinery and heights. Tr. 332.  Dr.
Tedesco's assessment permits Borino to perform a limited
range of light work.

On April 10, 2007, Borino had an appointment
with Dr. Santioni regarding her fibromyalgia and
cervical disc disease.[42] Tr. 384. The physical
examination on this date was normal except Borino
"exhibit[ed] multiple tender points consistent with
fibromyalgia." Id.  Borino appeared in no acute
distress and had no synovitis of the upper or lower
extremities. Id.

On May 22, 2007, Borino had an appointment with
Martin B. Fried, M.D., a gastroenterologist, regarding
frequent loose bowel movements and epigastric pain.[43] Tr.

-------

42.  The diagnostic testing as of this date only
revealed minimal degenerative disc disease.

43.  The epigastrium is defined as "the upper middle

(continued...)

335-336.  The report of this appointment notes Borino's "questionable irritable bowel syndrome from the age of 13, and GERD." Tr. 335.  The report further states that the review of systems was negative with respect to "skin, eyes, ears, nose, throat, psychiatric, pulmonary, cardiac, neurologic, endocrine, hematologic, musculoskeletal, or other gastrointestinal signs or symptoms[.]" Id.  The physical examination was essentially normal but revealed that Borino was morbidly obese. Tr. 336. It was noted that Borino's "spine and thorax are normally curved and non-tender." Id.  There was "[m]ild tenderness . . . in the epigastric area." Dr. Fried ordered blood work and "a colonoscopy with biopsy to rule out inflammatory bowel disease, celiac disease, or other pathology." Id.

On June 12, 2007, Borino had an appointment with Dr. Farrell. Tr. 346-347.  The notes of this appointment

---

43.  (...continued)
region of the abdomen[.]" Dorland's Illustrated Medical Dictionary, 627 (30th Ed.  2003).

are partially illegible and we will not attempt to decipher them.

On June 13, 2007, Borino had a colonoscopy which involved biopsies. Tr. 338.  The results of this procedure were normal other than Borino had internal hemorrhoids. Id.  Furthermore, the biopsies did not reveal any disease process. Tr. 337.

On June 25, 2007, Borino had blood work (CCP Antibody, Erythrocyte Sedimentation Rate, Rheumatoid Factor, ANA) which was ordered by Dr. Santioni. Tr. 372-374 and 379-380.  All of the tests were negative or normal other than the CCP Antibody test. Tr. 379.  The results of that test were at the lower end of the moderate/strong positive range.[44] Id.  Borino had an appointment with Dr. Santioni on July 10, 2007. Tr. 385. At that appointment Borino complained of "hurting all over." Id.  Dr. Santioni did not note any abnormal physical examination findings other than "18/18 tender

_____

44.  The ranges were <20 negative; 20-39 weak positive; 40-59 moderate/strong positive; and >59 strong positive. Borino's result was 40.

points only." Id.  Dr. Santioni did note that Borino

appeared depressed. Id.  Borino was continued on her

current medications. Id.

On October 29, 2007, Borino had an appointment

with Dr. Farrell.  Tr. 340 and 343-344.  At this

appointment, Borino complained of headaches and

forgetting things. Id.  Dr. Farrell's physical

examination of Borino revealed that Borino was alert and

oriented in three spheres (time, place, and person), was

in no acute distress, well-groomed, and her speech and

extraocular movements were normal.[45]  Tr. 343.  Borino

did have right paracervical muscle spasm and decreased

range of motion in her cervical spine but her gait and

strength were normal. Id.  Dr. Farrell also performed a

mental status examination and noted that Borino's

judgment, ideomotor effect[46] and ability to interpret

_____

45.  Observing extraocular movements relates to the
testing of the eye muscles.  Abnormal findings could be
the result of problems with the muscles of the eye or
the nerves or part the brain that controls the muscles.

46.  Ideomotor is defined as "aroused by an idea or
                                        (continued...)

proverbs were all "ok." Id.  It also appears that Borino
was able to remember 2 out of 3 words after three to
five minutes and spell the word "world" backwards. Id.
Dr. Farrell also noted that Borino "follows instructions
well." Tr. 344.  Dr. Farrell's diagnosis was that Borino
suffered from cervical myofascial spasm and
fibromyalgia. Id.  Dr. Farrell prescribed stretching,
moist heat hydrotherapy and medications. Id.

Also, on October 29, 2007, Borino had an
appointment with Dr. Santioni. Tr. 386.  Borino
complained of "persistent neck pain mostly on the right
side" and headaches. Id.  Dr. Santioni noted that Borino
was in no acute distress and the only abnormal physical
examination finding noted was "[t]enderness to palpation
[left] lateral epicondyl[e]."[47]  Id.  Dr. Santioni's

---

46.  (...continued)
thought; said of involuntary motion so aroused."
Dorland's Illustrated Medical Dictionary, 905 (30th Ed.
2003).

47. A condyle is a round projection on a bone which
usually joins with a another condyle forming a joint.
An epicondyle is "an eminence upon a bone, above its
(continued...)

44

assessment was that Borino suffered from fibromyalgia and prescribed medications. <u>Id.</u>  Dr. Santioni also ordered a total body bone scan. <u>Id.</u>  That procedure was performed on November 1, 2007, at Wyoming Valley Health Care System, Imaging Services. Tr. 361.  The results were normal. <u>Id.</u>

On November 9, 2007, Dr. Torbik[48] completed on behalf of Borino what appears to be a physical functional capabilities assessment required by Hartford Insurance Company. Tr. 391.  Dr. Torbik stated that Borino could occasionally[49] lift and/or carry up to 20

---

47. (...continued)
condyle[.]" Dorland's Illustrated Medical Dictionary, 625 (30th Ed.  2003).  It is not clear what joint Dr. Santioni was referring to because there is a lateral condyle on several bones, including the humerus (upper arm bone), the femur (the thigh bone), and the tibia (one of the lower leg bones). <u>Id.</u> at 406.

48. Dr. Torbik was Borino's primary care physician.

49. "Occasionally" is defined as up to 1/3 of an 8-hour workday.

pounds.[50] Id.   Dr. Torbik did not specify the amount of
weight Borino could frequently lift and/or carry. Id.
Dr. Torbik stated that Borino could never use her
bilateral hands; that Borino could occasionally bend at
the waist, kneel, stoop and drive; and that Borino could
occasionally reach with the left upper extremity above
the shoulder, at waist/desk level and below waist/desk
level.[51]   Id.   Dr. Torbik noted that the physical
functional restrictions were permanent and that Borino
could not participate in vocational rehabilitation
services. Id.   Dr. Torbik stated that Borino did not
have a psychiatric or cognitive impairment. Id.

-------

50.  An ability to occasionally lift up to 20 pounds is
consistent with an ability to perform light work.

51.  The statement by Dr. Torbik that Borino could never
use her hands is not only inconsistent with an ability
to drive but also inconsistent with Borino's reported
activities of daily living. Borino cared for two young
children (ages ten and four) and failed to note that
she had any problems with her hands on a "check-box"
form submitted to the Social Security Administration.
Tr. 123 and 128.  Furthermore, Borino admitted that she
was able to prepare simple meals, including sandwiches,
frozen dinners, cereal, and toast. Tr. 125. She further
admitted that she could fold laundry. Id.

On November 16, 2007, Dr. Santioni completed a
similar form. Tr. 377-378.  Dr. Santioni's assessment
was identical to the one provided by Dr. Torbik. Id.

On January 15, 2008, Dr. Santioni submitted to
The Hartford Insurance Company a supplemental statement
of Borino's functional abilities. Tr. 365-371.  In that
supplement, Dr. Santioni noted that Borino could
occasionally engage in bilateral handling of items
(defined as gross motor for gripping, holding or
grasping), fingering (defined as fine motor use) and
feeling (defined as sensing temperatures and textures).
Tr. 366-368.  Dr. Santioni noted that the basis for
these limitations was "constant chronic pain." Id.  Dr.
Santioni did not list any objective medical findings.

In the supplemental form, Dr. Santioni also
stated that Borino could not reach with her left arm at
the waist but did not specify a clinical rationale for
such limitation. Tr. 369. Dr. Santioni stated that
Borino could not sit for 6 to 8 hours even if she was
intermittently permitted to "change her position and/or

47

stretch."    Id.   Again when asked to do so, Dr. Santioni did not provide a clinical rationale. Id.  Dr. Santioni stated without providing a clinical rationale that Borino could only sit 20 to 30 minutes in an 8-hour workday. Id.

Borino subsequently had appointments with Dr. Santioni on January 29, April 29, and July 22, 2008. Tr. 386 and 394.  At those appointments, Borino complained of pain or swelling for which Dr. Santioni prescribed medications and ordered additional testing. Id.  At the appointment on January 29, Dr. Santioni noted that Borino's general physical appearance was within normal limits and with respect to the musculoskeletal examination Dr. Santioni stated that there was no synovitis. Tr. 386.  At the appointment on April 29, Borino was awake, alert and oriented to person, place and time and "well appearing." Tr. 394.  Dr. Santioni did note some non-pitting ankle edema, calf tenderness and joint tenderness but, as stated above, no synovitis. Id.

48

At the appointment on July 22, Borino was awake, alert and oriented to time, place and person, in no acute distress and "looking well." Id.  Dr. Santioni noted "18/18 tender points" but stated there was no synovitis. Id.

On December 19, 2008, Borino had an MRI of the cervical spine which revealed disc degeneration at the C4-C5 level resulting in mild impingement on the thecal sac[52] and "no spinal cord impingement or foraminal encroachment." Tr. 416.

**DISCUSSION**

The administrative law judge, at step one of the sequential evaluation process, found that Borino had not engaged in substantial gainful work activity since October 6, 2006, the alleged disability onset date. Tr. 15.

───────────────

52. The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

49

At step two of the sequential evaluation process, the administrative law judge found that Borino had the following severe impairments: fibromyalgia, degenerative disc disease of the cervical spine, and obesity. Id.  The administrative law judge found that Borino's alleged knee and hand problems, overactive bladder, gastrointestinal problems and depression were non-severe impairments. Tr. 16.

At step three of the sequential evaluation process, the administrative law judge found that Borino's impairments did not individually or in combination meet or equal a listed impairment. Tr. 16-17.

At step four of the sequential evaluation process, the administrative law judge found that Borino could not perform her prior relevant work but that she had the residual functional capacity to perform a limited range of unskilled, light work.  Tr. 13. Specifically, the administrative law judge found that

Borino could perform unskilled, light work which
permitted:

> a sit/stand option at will, occasional climbing,
> balancing, stooping, kneeling, crouching and
> crawling, never on ladders, a right upper
> extremity overhead reach limitation, must avoid
> temperature extremes, humidity, vibration, and
> hazard, and limited to simple routine tasks,
> with low stress as defined as no decision
> making, and no changes in the work setting.

Tr. 18.  In concluding that Borino had the residual
functional capacity to engage in a limited range of
light work, the administrative law judge relied, *inter
alia*, on the opinion of Dr. Tedesco, the state agency
physician who found that Borino could perform a limited
range of light work.  The administrative law judge
rejected the opinion of Dr. Santioni and the opinion of
Dr. Torbik. Tr. 19.

At step five, the administrative law judge,
based on a residual functional capacity of a limited
range of light work as described above and the testimony
of a vocational expert, found that Borino had the
ability to perform unskilled, light work as an
inspector, packager and order filler, and that there

51

were a significant number of such jobs in the regional and state economies. Tr. 21 and 40-41. The vocational expert also identified jobs at the unskilled, sedentary level with the additional limitation noted by the ALJ (i.e., sit/stand option at will, etc.) which Borino could perform. Tr. 40-41.  Specifically, the vocational expert identified unskilled, sedentary positions of surveillance system monitor, assembler and visual inspector. Id.

The administrative record in this case is 423 pages in length and the court has thoroughly reviewed that record.  The administrative law judge did an adequate job of reviewing Borino's vocational history and medical records in her decision. Tr. 13-21. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. (Doc. 19, Brief of Defendant.)

Borino argues that the administrative law judge erred by (1) failing to appropriately consider and find Borino's urinary incontinence and irritable bowel

syndrome to be a severe impairment, (2) failing to
recognize that Borino's medical conditions met or
equaled a listed impairment, and (3) failing to find
Borino's alleged limiting symptoms credible.  The court
finds no merit in Borino's arguments.

At step two, the administrative law judge found
that Borino suffered from severe impairments.  If
Borino's severe impairments met or equaled a listed
impairment, she would have been considered disabled *per
se* and awarded disability benefits.  However, a claimant
has the burden of proving that his or her severe
impairment or impairments meet or equal a listed
impairment.  Sullivan v. Zebley, 493 U.S. 521, 530
(1990).  To do this a claimant must show that all of the
criteria for a listing are met or equaled.  Id.  An
impairment that meets or equals only some of the
criteria for a listed impairment is not sufficient.  Id.

The administrative law judge concluded that
Borino did not have an impairment or combination of
impairments that met or equaled any of the listed

impairments in 20 C.F.R. pt. 404, subpart P, app. 1.  To
qualify for benefits by showing that an impairment, or
combination of impairments, is equivalent to a listed
impairment, Borino had the burden of presenting "medical
findings equal in severity to all the criteria for the
one most similar listed impairment."  Id. at 531.
Borino has proffered no medical opinion, nor has she
marshaled the evidence in the record to support her
contention that her conditions meet or equal the
requirements of a listed impairment.

Borino argues in a conclusory fashion that the
listings which she meets are section 1.00 *et seq.* and
11.00 *et seq.*, listings that the administrative law
judge in fact considered.  Borino does not state how her
conditions meet or equal those listings.

No treating or examining physician found that
Borino's impairments met or equaled the criteria of a
listed impairment.  We find no error in the
administrative law judge's conclusion that Borino's
impairments, individual or combination, did not meet or

equal a listed impairment under the Social Security regulations.  The ALJ's decision when read in its entirety sufficiently addresses the issue of whether Borino's severe impairments met or equaled the criteria of a listed impairment.

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements.  20 C.F.R. § 404.1508 (2007).

Although the opinions of the treating physicians - Dr. Santioni and Dr. Torbik - seem to limit Borino to less than full-time work, we discern nothing in the treatment notes of those physicians that would prevent

Borino from engaging in the extremely limited range of
light work identified by the ALJ.   Furthermore, as
noted, there were sedentary positions identified by the
vocational expert which Borino could perform.

The opinions of Dr. Santioni and Dr. Torbik are
not only unsupported by treatment records, but also
inconsistent with other evidence, i.e., the opinion of
Dr. Tedesco.   The administrative law judge appropriately
accepted the opinion of Dr. Tedesco.

The administrative law judge's residual
functional capacity assessment is supported by the
medical records and the opinion of Dr. Tedesco.   The
administrative law judge's reliance on Dr. Tedesco's
opinion was appropriate. See Chandler v. Comm'r of Soc.
Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found
that the [state agency physician's] report was properly
considered by the ALJ, we readily conclude that the
ALJ's decision was supported by substantial
evidence[.]").

The administrative law judge appropriately took into account Borino's physical and mental limitations in the residual functional capacity assessment.  The administrative law judge limited Borino to a range of unskilled, light work.  The vocational expert identified jobs that met those requirements and the administrative law judge appropriately accepted the vocational expert's testimony.

The administrative law judge stated that Borino's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled light work. Tr. 19.  The administrative law judge was not required to accept Borino's subjective claims regarding her physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to

make).   It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."   Walters v. Comm'r of Soc. Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness's credibility.").   Because the administrative law judge observed Borino when she testified at the hearing on October 14, 2008, the administrative law judge is the one best suited to assess the credibility of Borino.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then, when setting a claimant's residual functional capacity, considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529.

The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation
process, is a threshold test. 20 C.F.R. § 404.1520(c).
If a claimant has no impairment or combination of
impairments that significantly limit the claimant's
physical or mental abilities to perform basic work
activities, the claimant is "not disabled" and the
evaluation process ends at step two. Id.  If a claimant
has any severe impairments, the evaluation process
continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to
find a medical condition severe at step two will not
render a decision defective if some other medical
condition was found severe at step two.  However, all of
the medically determinable impairments, both severe and
non-severe, must be considered at step four when setting
the residual functional capacity.  The social security
regulations mandate such consideration and this court
has repeatedly so indicated. See, e.g., Christenson v.
Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May
18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-

1626, slip op. at 19-21 (M.D. Pa. Sept. 14, 2011)(Kosik, J.); <u>Crayton v. Astrue</u>, Civil No. 10-1265, slip op. at 32-35 (M.D. Pa. Sept. 27, 2011); 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

With regard to Borino's alleged urinary incontinence, the record indicates that the condition was controlled with medication. As for Borino's knee and hand problems, the ALJ provided a sit/stand option at will and limited the use of Borino's right upper extremity  for overhead reaching. Finally, with respect to her alleged depression and problems with concentration and memory, the ALJ limited Borino to simple routine tasks and low stress positions defined as no decision making and no changes in the work setting. We are satisfied that the ALJ, in setting Borino's residual functional capacity, adequately considered all of Borino's medically determinable impairments, both severe and non-severe.

After the administrative law judge issued her decision, Borino's attorney submitted further evidence,

60

i.e., the report of the MRI of the cervical spine
performed on December 19, 2008, to the Appeals Council.
Evidence submitted after the administrative law judge's
decision cannot be used to argue that the administrative
law judge's decision is not supported by substantial
evidence.  Matthews v. Apfel, 239 F.3d 589, 594-95 (3d
Cir. 2001).  The only purpose for which such evidence
can be considered is to determine whether it provides a
basis for remand under sentence 6 of section 405(g), 42
U.S.C.  Szubak v. Sec'y of Health and Human Servs., 745
F.2d 831, 833 (3d Cir. 1984).  Under sentence 6 of
section 405(g), the evidence must be "new" and
"material" and a claimant must show "good cause" for not
having incorporated the evidence into the administrative
record. Id.  Although the MRI of December 19, 2008, is
"new evidence," we are not convinced that it is
"material."  The results of the December 19, 2008, MRI
are not substantially different from the MRI performed
on December 21, 2006.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g), affirm the decision of the Commissioner.

An appropriate order will be entered.


                              s/Sylvia H. Rambo
                         United States District Judge

Dated:  May 8, 2012.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ERIKA P. BORINO,                 :
                                 :
        Plaintiff               :    CIVIL NO. 4:10-CV-2135
                                 :
    vs.                          :
                                 :
MICHAEL J. ASTRUE,               :
COMMISSIONER OF SOCIAL           :    (Judge Rambo)
SECURITY,                        :
                                 :
        Defendant               :

## ORDER AND JUDGMENT

In accordance with the accompanying memorandum,

**IT IS HEREBY ORDERED THAT:**

1. The Clerk of Court shall enter judgment in favor of the Commissioner and against Erika P. Borino as set forth in the following paragraph.

2. The decision of the Commissioner of Social Security denying Erika P. Borino disability insurance benefits and supplemental security income benefits is affirmed.

3.   The Clerk of Court shall close this case.


     s/Sylvia H. Rambo
     United States District Judge

Dated:  May 8, 2012.